LESSER-GOLDMAN COTTON COMPANY, Appellant, v. MISSOURI PACIFIC RAILROAD COMPANY.—12 S. W. (2d) 485.

Division One, December 31, 1928.

*Lewis, Adler & Laws* and *Lewis & Rice* for appellant; *Otto Wolff, Jr.,* of counsel.

*Thomas J. Cole* and *Thomas T. Railey* for respondent.

716

GENTRY, J.—Plaintiff, a domestic corporation, sued defendant, as a common carrier, for damages on account of the destruction by fire of a consignment of cotton from Pine Bluff, Arkansas, to New Orleans, Louisiana.

The petition alleged the corporate capacity of plaintiff and that of defendant, stating that defendant was engaged as a common carrier in the transportation of chattels for hire from Pine Bluff, Arkansas, to New Orleans, Louisiana; that on November 29, 1920, plaintiff was the owner of eighty-seven bales of cotton of the value of $14,398.40, and that it delivered the same to the defendant at Pine Bluff, Arkansas, for shipment to New Orleans, Louisiana. It was further alleged that the defendant, in consideration of certain freight charges which were prepaid by plaintiff, then and there accepted said cotton, and issued and delivered to plaintiff five certain bills of lading, all of the same tenor, and all attached as exhibits to the petition. That the defendant thereby and "in connection with other carriers on the route, undertook and agreed to transport and carry said eighty-seven bales of cotton from Pine Bluff, Arkansas, to New Orleans, Louisiana, and there to deliver the same to a certain ocean steamship company, known as the Elder-Dempster Line, for transportation by ocean carrier from the port of New Orleans, Louisiana, to the port of Liverpool, England. It was further alleged that the bills of lading were executed and delivered by one W. B. Wier, as agent of the defendant and of the Elder-Dempster Line, severally and not jointly, and that the same included three separate and distinct contracts: first, a contract under which defendant agreed to carry said cotton from Pine Bluff, Arkansas, to New Orleans; second, the contract under which the Elder-Dempster Line agreed to carry said cotton from New Orleans to Liverpool, England; and, third, the contract under which said cotton was to be carried from Liverpool, England, to the ultimate destination, if destined beyond that port.

The petition stated the weight of the different bales of cotton and the address, the marking and rating thereof; and it was also alleged that on December 9, 1920, all of said cotton, while in the possession of defendant, was totally destroyed by fire at Lynch Spur, Louisiana, by reason of which defendant became liable to plaintiff, the lawful holder of said bills of lading, for the full value thereof, notwithstanding any limitations, etc. As a part of the petition, a copy of the act of Congress approved March 4, 1915, as amended by Congress August 9, 1916, known as the Cummins Amendment, was copied in full into the petition. It is further alleged that the freight was prepaid by the defendant to the plaintiff for the transportation of the cotton aforesaid, and that the same was not based upon a value of said cotton declared in writing by the plaintiff, or agreed upon by it in writing, as the released value thereof, nor was the defendant authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value of the property declared in writing by the shipper, or agreed upon in writing as the released value thereof. It was finally alleged that plaintiff made demand upon defendant for the full value of the said cotton, but that the defendant refused to pay the same; wherefore judgment was prayed, etc.

The answer was a general denial. A trial before the court, without a jury, resulted in a verdict and judgment for the defendant, and plaintiff, observing due legal formality, prosecuted its appeal.

As all of the bills of lading are the same, the substance of only one of them will be set out. It is as follows:

"Missouri Pacific Railroad Company

"In connection with other carriers on the route.

"Through Bill of Lading Issued Under Agreement with the Liverpool Cotton Bills of Lading Conference (1907) Committee and the American Bankers' Association.

"Received at Pine Bluff, Ark., from Lesser-Goldman Cotton Co., the following property in apparent good order, except as noted (contents and condition of contents of packages unknown) and except that bales of cotton or linters are insufficiently covered by bagging, or such covering is torn, and as to any loss or damage on account of these conditions, or either of them, it is mutually understood and agreed that no carrier on the route to destination shall be liable; marked, numbered, consigned and destined as indicated below:

Consignee and Destination

Shippers Order, Lesser-Goldman Cotton Co.,
Liverpool, England.

"Party to be notified
Muir-Duckworth,
Liverpool, England,
Inland Routing ..........................................

Articles
(Twenty-five Bales of Cotton Compressed)
Freight Prepaid through to Destination
Inland .....................................$117.24
Ocean ..................................... 174.89
_____
Total ......................................$292.13
Two Hundred Ninety-Two Dollars Thirteen Cents.

Shippers Weight 12,955 Pounds. (Subject to Correction.) (U. S. Law requires agents issuing Bill of Lading to write either 'shipper's' or 'carrier's' before 'weight.')

"To be carried to the Port (A) of New Orleans, Louisiana, and thence by Elder-Dempster Line to the Port (B) Liverpool, England (or so near thereto as steamer may safely get, with liberty to call at any port, or ports in or out of the customary route), and to be there delivered in like good order and condition, as above consigned, or to consignee's assigns, or to another carrier on the route to destination if consigned beyond said port (B), upon payment immediately on discharge of the property, of the freight thereon, at the rate from Pine Bluff, Arkansas, to Liverpool, England. Inland 90½ ocean 1.35 cents."

There were other provisions not material to this decision. The concluding paragraph, however, is:

"In Witness Whereof, the Agent signing on behalf of said Missouri Pacific Railroad Company, and of the said Ocean Steamship Company or Ocean Steamer and her owner, severally and not jointly, hath affirmed to . . . Bills of Lading, all of this tenor and date, one of which bills being accomplished the other to stand void.

Dated at Pine Bluff, Arkansas, this 29th day of November, 1920.

(signed)          W. B. WIER,
Division Freight Agent.
——————————— Agent.

On behalf of carriers severally but not jointly.
Lesser-Goldman Cotton Co.,
Shipper."

The bill of lading referred to certain conditions on the back thereof, one of which is as follows: "(1) No carrier or party in possession of any or all of the property herein described shall be liable for any loss thereof or damage thereto, by causes beyond its control; or by floods or fire."

There was a stipulation signed by parties and offered in evidence, as follows:

(1)   That plaintiff is a corporation organized under the laws of Missouri, with its principal place of business at St. Louis.

(2)   That defendant is a corporation organized under the laws of Missouri and engaged as a common carrier of goods for hire from Pine Bluff, Arkansas, to New Orleans, Louisiana, and other points.

(3)   That on November 9, 1920, plaintiff being the owner of eighty-seven bales of cotton, all in good order and condition, delivered said cotton to defendant at Pine Bluff, Arkansas, and the defendant in consideration of a certain freight charge which plaintiff prepaid, accepted said cotton and issued and delivered to plaintiff five bills of lading, all of like date and effect, wherein and whereby defendant, in connection with other carriers on the route, undertook and agreed to transport and carry said cotton from Pine Bluff, Arkansas, to New Orleans, Louisiana, and there to deliver the same to a certain ocean steamship company, known as the Elder-Dempster Line, for transportation by ocean carrier from the port of New Orleans to the port of Liverpool, England, but nothing contained in the stipulation shall be construed as an admission by defendant that the contract or portion of the contract covering the ocean transportation should or should not be considered separate and distinct from the contract or portion of the contract covering the inland transportation, but as to that fact the contract shall speak for itself.   It is further stipulated that the inland rate was 90½¢ per cwt. and that the ocean transportation rate was $1.35 per cwt.   The inland rate from Pine Bluff to New Orleans, was $609.45.   It is further stipulated that upon the arrival of said cotton at Lynch Spur, Louisiana, on December 9, 1920, while still in the possession of defendant, without any evidence of negligence on the part of either plaintiff or defendant, it was totally destroyed by fire.   Defendant thereupon tendered to plaintiff the charges paid by plaintiff for the ocean transportation, but plaintiff refused to accept the same.

The principal questions for decision in this case are the nature of the shipment of cotton in question, and the character of the bills of lading, whether the shipment is interstate or a shipment to a nonadjacent foreign country.

I. The Interstate Commerce Act became effective February 4, 1887 (24 St. at L. 379), and the Carmack Amendment became effective June 29, 1906 (See 34 St. at L. 595, 3591). The Carmack Amendment is as follows:

"Any common carrier, railroad, or transportation company receiving property for transportation from a point in one State to a point in another State shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which said property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad or transportation company from the liability hereby imposed: *Provided,* That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law.

"That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof."

The provisions of the Carmack Amendment were amplified by the Act of March 4, 1915 (38 St. at L. 1196) and August 9, 1916 (39 St. at L. 441), known as the Cummins Amendment. These amendments are as follows:

"That any common carrier, railroad, or transportation company subject to the provisions of this Act receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, and no contract, receipt, rule, regulation or other limitation of any character whatsoever, shall exempt such common carrier, railroad or transportation company from the liability hereby imposed; and any such common carrier, railroad or transportation company so re-

ceiving property for transportation from a point in one State, Territory or the District of Columbia to a point in another State or Territory, or from a point in a State or Territory to a point in the District of Columbia, or from any point in the United States to a point in an adjacent foreign country, or for transportation wholly within a Territory, shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage or injury to such property caused by it or by any such common carrier, railroad or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation or in any tariff filed with the Interstate Commerce Commission; and any such limitation, without respect to the manner or form in which it is sought to be made, is hereby declared to be unlawful and void . . . *provided, however*, That the provisions hereof respecting liability for full actual loss, damage, or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value, and declaring any such limitation to be unlawful and void, shall not apply, first, to baggage carried on passenger trains or boats, or trains or boats carrying passengers: second, to property, except ordinary live stock, received for transportation concerning which the carrier shall have been or shall hereafter be expressly authorized or required by order of the Interstate Commerce Commission to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released, and shall not, so far as relates to values, be held to be a violation of Section 10 of this act to regulate commerce, as amended; and any tariff schedule which may be filed with the commission pursuant to such order shall contain specific reference thereto and may establish rates varying with the value so declared or agreed upon; and the commission is hereby empowered to make such order in cases where rates dependent upon and varying with declared or agreed values would, in its opinion, be just and reasonable under the circumstances and conditions surrounding the transportation. The terms 'ordinary live stock' shall include all cattle, swine, sheep, goats, horses and mules, except such as are chiefly valuable for breeding, racing, show purposes or other special uses.''

It is conceded that a through bill of lading was issued covering the transportation of the property in question from Pine Bluff, Arkansas, to Liverpool, England. The bill of lading is entitled, "Through Bill of Lading." It acknowledged receipt of the shipment in the following language: "Received at Pine Bluff, Arkansas, from Lesser-Goldman Cotton Company the following property . . . marked, numbered, consigned and destined as indicated below." While the bill of lading so executed is on behalf of the carriers severally and not jointly, and each carrier limited its liability to its own handling, this did not make the bill of lading other than a through bill. Evidently appellant expected to get some benefit from the billing of this shipment as it did, for it could have consigned the goods directly to itself or its agent at New. Orleans, and said nothing about any ocean carrier. It matters not what reason appellant had for asking and accepting such a bill of lading; we must presume it did so from choice. The rate charged and collected and the name of the consignee and the place of delivery (London, England) are set out in full. This bill of lading is what it is termed, a "Through Bill of Lading," and the shipment thereunder was not interstate, but rather to a non-adjacent foreign country.

II. But even if the bill of lading does not govern in a case of this kind, the intention of the parties will govern. The Carmack Amendment provides: "Any common carrier . . . receiving property for transportation from a point in one State to a point in another State shall issue a receipt or bill of lading therefor," etc. The tendering of property for transportation from a point in one State to a point in another State brings the transaction within the provisions of the Carmack Amendment. So, the tendering of property for transportation from a point in one State to a point in a non-adjacent foreign country is a transaction wholly outside the provisions of the Carmack Amendment and outside the provisions of the Cummins Amendment. There is no evidence, either written or oral, that appellant intended to have the control or management of the property included in this shipment, either at New Orleans or any other place. We have a right to assume that appellant wanted to be relieved of the care and responsibility of the same. It, therefore, turned the property over to respondent, and the notation regarding the rates to be charged, the payment of the freight in advance according to those rates and the execution of the paper by the agent for the steamship line clearly indicate a contract between the shipper and the carrier for a shipment to a non-adjacent foreign country.

In so deciding, we are following the decision of the Supreme Court of the United States in the case of Missouri Pacific Railroad Co. v. Porter, 273 U. S. 341, which was similar to the instant case, the same being an action for damages on account of the destruction by fire of certain bales of cotton shipped from Earl, Arkansas, to Brunswick, Georgia, destined to Liverpool, England. The Supreme Court of Arkansas held that the carrier was liable; but on writ of error to the Supreme Court of the United States, it was held that the Carmack Amendment and the Cummins Amendment did not apply to such shipment. Accordingly, the shipper was denied recovery.

The Circuit Court of Appeals in a case where coal was shipped from inland points to Atlantic ports, destined to Europe, said that the Cummins Amendment to the Carmack Amendment had no application, because the amended section is confined to transportation which is wholly interstate or from any point in the United States to an adjacent foreign country. [Dexter v. Davis, 281 Fed. 385.]

The Maryland Court of Appeals held that, in a shipment of grain, which was destroyed during transportation, there being a limitation upon the carriers' liability, the owner of the grain could not recover, as the grain was shipped from an interior point to Baltimore, shipped for the avowed purpose of transportation to Europe, to non-adjacent foreign countries. [Fahey v. B. & O. Railroad, 114 Atl. 905.]

The Kansas Supreme Court had before it a case of the shipment of grain from Kansas to Galveston, Texas, with the notation thereon: "For Export." This grain was destroyed during transportation and the court held that it was the duty of the plaintiff to show that the shipment was intended for an adjacent foreign country, and failing to so show, he could not recover. [Barber v. Mo. Pac., 236 Pac. 859.]

The Wisconsin Supreme Court, where goods were transported from a point in Wisconsin to Cape Town, South Africa, and there was a provision in the bill of lading limiting the liability of each carrier to loss or destruction on its own line, said: "This being a shipment to a foreign country, the Carmack Amendment did not apply and it was competent for the parties to make a contract limiting plaintiff's liability to its own line." [Railroad v. Jewett, 171 N. W. 757.]

We see no objection to W. B. Wier acting as agent for both carriers, but not jointly; such action on his part cannot deprive the bill of lading of the character herein designated. It was clearly a through bill of lading and must have been so considered by the parties at the time of its execution.

The judgment of the Circuit Court, which was for the defendant, being for the right party, is affirmed. All concur.